UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1182

ALLISON WILLIAMS,

Plaintiff, Appellant,

v.

MONARCH MACHINE TOOL COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Cyr and Boudin,

Circuit Judges.

Joseph M. Orlando with whom Brian S. McCormick and Orlando &

Associates were on brief for appellant.

Terrance J. Hamilton with whom Casner & Edwards was on brief for

appellee.

June 9, 1994

BOUDIN, Circuit Judge. On March 23, 1988, Allison

Williams, plaintiff in the district court and appellant here,

was injured when he was struck by a "toolholder" that came

loose from a vertical milling machine. At the time, Williams

was working in Massachusetts for R&K Precision Tool Company

("R&K"). The vertical milling machine, owned by R&K, had

been made in 1978 by Monarch Machine Tool Company

("Monarch"), the defendant-appellee in this case.

The machine in question was a computer assisted

machining center that performs various functions such as

milling, boring and fly cutting. At the time of the

accident, the machine was being operated by a co-worker of

Williams who had attached to the machine a fly cutter that

had been made "in-house" by R&K. The fly cutter is a disk

into which a toolholder and attached tool can be inserted.

The fly cutter then rotates on the spindle of the vertical

milling machine and the rotating tool can be used to cut or

shave a piece of metal.

In this instance, the co-worker who was operating the

vertical milling machine had been requested by his foreman to

machine a piece of aluminum into a specific configuration.

After a few seconds of operation, in which the spindle

rotated at 2500 rpms, the toolholder came loose from the set

screws holding it to the fly cutter, and the toolholder

struckWilliamswho wasstanding nearby.He wasseriously injured.

-2-

Williams brought suit in the district court against

Monarch. His complaint, claiming negligence and breach of

warranty, rested on two notions as to what Monarch had done

wrong. First, Williams contended that Monarch should have

provided shielding to contain ejected projectiles, a danger

that Williams said was known to Monarch. Second, the

complaint said that Monarch should have warned users of the

risk of such ejections so that in-house measures could be

taken; in this connection, Williams contended that Monarch

had an ongoing duty to warn prior purchasers of new shielding

equipment developed after the machine's manufacture late in

1978 but before the accident in 1988.

The trial took place in January 1993. At trial, there

was expert evidence on both sides on issues of shielding,

warning and causation. There was also evidence concerning

proper use of the vertical milling machine and the industry

standards bearing on the respective responsibilities of

manufacturers and users in providing guards and shields.

Answering specific interrogatories, the jury found against

Williams, and for Monarch, on each of the claims against

Monarch.

Following the jury verdict, Williams moved for a new

trial asserting as grounds the two issues now raised on this

appeal. One is Williams' claim that the district court

wrongly admitted testimony from a second expert witness, who

-3-

was belatedly produced by Monarch and who testified at trial;

and the other is that an instruction requested by Williams,

affirming the manufacturer's ongoing duty to warn even after

a machine is sold, should have been given. The district

court denied the motion, and Williams appealed. We affirm.

The events relating to the second expert can be briefly

summarized. As is common in cases where experts are

anticipated, interrogatories under Fed. R. Civ. P. 26 were

employed by the parties to identify experts and their

expected testimony. After successive extensions, Monarch on

October 16, 1991, identified its expert as David Lundeen, a

vice president of Monarch, and described the substance of his

testimony. Williams' answers identified his own expert.

Thereafter, Lundeen was deposed by Williams.

At a March 26, 1992, pretrial conference, the district

court set January 4, 1993, as a firm trial date. The court

also ordered the parties to make certain filings during the

four weeks preceding the trial date, including the listing of

the names of all witnesses, lay and expert. On December 4,

1992, a month before the scheduled trial, Monarch filed

"further supplemental answers" in response to Williams' prior

"expert" interrogatories identifying for the first time Ralph

Barnett as an additional expert witness.1

1The December 4 filing also identified another
previously unnamed expert for the defense. However, this
third expert was never proffered at trial and need not be

-4-

On December 28, 1992, Williams filed a motion in limine

to exclude Barnett's testimony on the ground that Barnett's

late appearance would prejudice Williams. At a hearing on

January 11, 1993, immediately before the start of trial, the

district court heard argument on the in limine motion and

offered to postpone the trial for a week and permit Barnett's

deposition to be taken. When Williams' counsel said that

this would not cure the prejudice, the court proceeded with

the trial immediately. Later, the court approved the taking

of Barnett's deposition during a recess of trial on January

13, 1993, the day before Williams' own expert was scheduled

to testify.

On appeal, Williams argues that the district court

abused its authority by refusing to exclude Barnett's

testimony. Williams contends that Barnett did not merely

repeat Lundeen's opinions but added new theories of his own.

Williams brushes aside the proffered one-week extension as

wholly inadequate to allow the counsel to depose Barnett, to

develop adequate rebuttal information, and to allow Williams'

own expert the time to adjust his own testimony to answer the

new theories. Monarch, in turn, belittles the importance of

Barnett's testimony and argues that his late appearances

violated no rule or order.

discussed further.

-5-

In our view, the last-minute appearance of new expert

witnesses, or substantial expansion of previously disclosed

expert testimony, has become a troublesome feature of civil

litigation. Such last-minute expert testimony is often

improvisation rather than ambush, but it can still undermine

trial preparations carefully made by an adversary over many

months or even years. For this reason, some district judges

enter pre-trial orders setting explicit deadlines for the

naming of experts and then allow new ones to be named after

those deadlines only for good cause shown. Cf. Local R. 26.4

(D. Mass.).

Rule 26 interrogatories do not have quite the same

effect. Formally, the answers reflect counsel's good-faith

expectation as to the experts to be offered, and the rules

themselves (as phrased in 1992) underscored this

qualification by imposing a duty "seasonally to supplement" a

prior answer identifying an expert or revealing the substance

of expert testimony. See former Fed. R. Civ. P. 26(e)(1)(B).

Of course, it would violate this duty to name belatedly an

expert who had been retained by the naming party at a

substantially earlier time. Here, however, Monarch says that

it named Barnett shortly after determining to use him, and

there is no evidence to the contrary.

Our situation falls somewhat in between an outright

requirement that experts be named no later than a specified

-6-

date and the ordinary use of Rule 26 interrogatories. Here,

the original scheduling order from the magistrate judge,

extended several times, directed that "full and complete

answers" to expert interrogatories be furnished by listed

dates and set still later dates for the completion of all

discovery. It may well have been the intention of the

magistrate judge that this be read as an outright cut-off for

the naming of experts even though the order is not framed in

quite these terms.

When on the day of trial the parties presented their

positions to the district court, the matter was blurred.

Williams did not explain his position with exactness, while

Monarch argued (untenably) that, even if a prior deadline had

been set, it was relaxed implicitly by the district court's

routine order saying that all witnesses be listed a month or

so before trial. Without resolving the dispute, the district

court said that it would not bar important expert testimony

in a case with a large ad damnum when a continuance would

remedy the problem. However the magistrate judge's order is

read, the district court was free to alter previous

deadlines.

Conversely, even if the magistrate judge's order left

open the ordinary supplementation option, this court has held

that trial judges have inherent discretionary authority to

exclude expert evidence where Rule 26 interrogatories have

-7-

been employed and where the court finds that the

supplementation was not seasonable. This is so even though

the late-named expert was disclosed as soon as he or she had

been retained. Fusco v. General Motors Corp., 11 F.3d 259,

265-66 (1st Cir. 1993); Thibeault v. Square D Co., 960 F.2d

239, 245 (1st Cir. 1992). If the district court in this case

had decided to preclude Barnett's testimony as not

"seasonably" disclosed, such a decision would likely have

been sustained.

But the broad discretion of trial judges to manage

scheduling, discovery and sanctions cuts both ways. Through

no one's fault, evidence is sometimes obtained belatedly when

a gap in proof is perceived or a new source is uncovered.

Discovery aims only to mitigate surprise, for nothing can

eliminate it entirely from trial practice. Interrogatory

answers are supplemented in widely varying circumstances, so

that great deference must be afforded to the judge on the

spot in devising the proper remedy. See, e.g., Nickerson v.

G.D. Searle & Co., 900 F.2d 412 (1st Cir. 1990).

Here, the trial court did offer a week's delay and a

good deal can be done in a week. We appreciate that counsel

who accepts a half measure under protest may preserve the

claim of error but greatly reduces the likelihood of success

in any later appeal. Yet, settling a case prepared for trial

requires compromises, and it is generally right to insist

-8-

that counsel take the best deal offered under protest, do the

best job possible and then (if the verdict goes the other

way) argue to the appeals court that what was allowed was not

enough. At least then there is a concrete record to show

what could be done in the time allowed.2

We do not suggest that Williams waived his right to

appeal by rejecting the district court's proposals. If

Williams' trial counsel thought that a week was close to

useless and had other reasons to move swiftly to trial,

nothing prevents Williams from arguing now on appeal that

preclusion of the testimony was the only permissible remedy.

But by rejecting the proffered half-measure, Williams

inclines a reviewing court to resolve any legitimate doubts

about whether a week might have been enough in favor of the

district judge's view that it would have been sufficient.

In this case we have reviewed the interrogatory answers

as originally directed to Lundeen's proposed testimony and

compared them to testimony actually given by Barnett at

trial. There is no value in repeating details here; it is

enough to say that Williams is right in urging that there

2In fact, the district court initially offered Williams
a continuance without limiting the offer to a week and only
specified the one-week delay when Williams did not state a
figure of his own, assertedly fearing a long delay in getting
the plaintiff's case to trial. There is little to suggest
that the district court would not have entertained a request
for a longer continuance, especially if based on a more
substantial effort by counsel to do the best he could during
the original week.

-9-

were substantial differences--not so much contradictions as

new theories--that required new lines of questioning by

Williams' counsel and new rebuttal from Williams' own expert.

What we cannot say is that the district court abused its

discretion in thinking that an extra week was enough to allow

Williams to adjust his position.

Williams points to the many demands on counsel in the

weeks before a scheduled trial, but what was offered was an

extra week to be derived by postponing the trial. Almost all

of this time was presumably available for the task of

deposing Barnett, gathering material about him and his

testimony and preparing Williams' own expert on any new

subject matter. Indeed, had Williams' counsel made the

effort, he would have been better placed at the end of the

week to argue that still more time was required. Under all

the circumstances, we do not find that the district court

abused its discretion in refusing to exclude Barnett's

testimony.

Williams' brief twice suggests that the district court

withdrew its original offer of a week's extension because

Williams refused to accept it as adequate to avoid prejudice

from the late disclosure. Without generalizing too broadly,

we agree that it would be a matter of some concern if a

district court refused to provide a limited postponement

unless the party offered it waived the party's claim that a

-10-

longer extension was required. In this instance, however, we

do not read the record to establish such retaliation.

We think that the district judge may reasonably have

gained the impression (based on the colloquy with Williams'

counsel) that Williams was not in fact interested in a

continuance in order to cure the surprise, but only in

preserving for appeal the position that the failure to

exclude Barnett's testimony was error. In all events, when

the district court finally announced its intention to proceed

with trial at once, there was no further response from

Williams' counsel. This would be a different case if at that

point Williams had said that he did want a week's continuance

and was merely refusing to waive his right to appeal.

Williams' second and quite separate claim of error is

directed at the district court's refusal to give the

following requested instruction:

The need to exercise reasonable care to
prevent injuries to foreseeable users of
a product included a duty at least to
inform user (sic) of a product [of]
safety improvement of equipment which
would lessen the risk of injury that has
developed after the sale of the product,
but before the injury occurs.

In requesting this instruction, which the district court

declined to give, Williams' trial counsel relied upon doCanto

v. Amtek Inc., 328 N.E.2d 873 (Mass. 1975), and H.P. Hood &

Sons, Inc. v. Ford Motor Co., 345 N.E.2d 683 (Mass. 1976).

-11-

It is Williams' position that the vertical milling

machine in question, made in 1978, should have been equipped

with an optional chip guard of a type that Monarch later came

to use for most of its machines; that by the late 1980's, 85

to 90 percent of newly produced Monarch machines were sold

with these enclosures; and that Monarch was aware of the

unguarded R&K machine and serviced it from time to time but

did not give R&K warning of the guards after the sale of the

machine but prior to the accident in 1988.

Williams does not claim that the instructions actually

given were faulty in defining Monarch's duty at the time it

made and sold the machine in question. Rather, Williams

argues that a manufacturer who has discharged all duties at

the time the product was produced and sold will still be

liable if it fails unreasonably to advise a prior purchaser

of the product of new, safety enhancing improvements made

after the sale. We can find no indication that such a rule

has been adopted in Massachusetts, whose law governs in this

case.

In doCanto, the decision principally relied on in

Williams' brief, the Massachusetts Supreme Judicial Court

sustained the admissibility of evidence showing improvements

made after the sale of the product but before the accident;

but the court did not adopt the view "that there was a

continuing duty to warn purchasers of safety improvements

-12-

[later] made to a machine which was reasonably safe at sale."

328 N.E.2d at 877. Rather, the court found that the evidence

was pertinent to issues of liability at the time of sale

(e.g., feasibility, knowledge of risk). Id. The court

implied that the manufacturer would have been entitled to a

limiting instruction on the permissible use of the evidence.

Id.

The doCanto decision goes no further than to say that a

duty to warn of post-sale safety improvements "may" exist

where the machine as originally sold was of "negligent

design." 328 N.E.2d at 877. This dictum, even if "does"

were substituted for "may," would do Williams no good because

in this case the jury's answers showed that it did not find

that the machine as originally sold had been negligently

designed. Indeed, in Hayes v. Ariens Co., 462 N.E.2d 273

(Mass. 1984), the court said: "We did not say in doCanto,

and we have never said, that a manufacturer has a duty to

advise purchasers about post-sale safety improvements that

have been made to a machine that was reasonably safe at the

time of sale."3

3The Hood case, also relied upon by Williams, is even

less helpful to Williams. Hood did involve in part a federal

statute governing motor vehicle defects, see 345 N.E.2d at

687, and the statute does address post-sale duties, see 15

U.S.C. 1402; but there is no claim that this federal
statute in any way governs vertical milling machines.

-13-

Some courts have adopted the view that there are broad

post-sale duties to warn, e.g., Kozlowski v. John E. Smith &

Sons Co., 275 N.W.2d 1915 (Wis. 1979), and there is some

academic support for this extension. E.g., Note, 33 Stan. L.

Rev. 1087 (1981). Yet, there is no suggestion that this

expanded duty is the prevailing view, still less that

Massachusetts has adopted any such expansion. "We have

warned, time and again, that litigants who reject a state

forum in order to bring suit in federal diversity

jurisdictions cannot expect that new trails will be blazed."

Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 744 (1st

Cir. 1990) (citations omitted).

Finally, if manufacturers were held in some situations

to have a duty to search out prior customers and tell them of

new improvements of products reasonably safe when sold one

would expect that a duty potentially so far reaching would be

qualified by other considerations and limitations (e.g., the

feasibility of conveying warnings to prior purchasers, the

severity of the hazard, an imbalance between the parties as

to knowledge). The broad language of the instruction

proffered by Williams in the trial court contains no such

restrictions. In our view, this makes it even more unlikely

that the instruction as framed represents the present state

of Massachusetts law.

Affirmed.

-14-